[No. 11722.   *En Banc.*   July 14, 1914.]

Isaac A. Hillestad *et al.*, *Respondents*, v. Industrial Insurance Commission, *Appellant.*[1]

Master and Servant—Relation—Workmen's Compensation Act —"Workman." The relation of master and servant does not exist between father and son, within the meaning of the workmen's compensation act, 3 Rem. & Bal. Code, § 6604-3, defining a "workman" as every person engaged in the employment of an employer carrying on specified industries, and Id., § 6604-4 providing that in computing the payroll, there shall be included the entire compensation of every workman, whether payable in the form of salary, wage, piece work, . . . money, board or otherwise," where it appears that a son, thirteen years of age, who desired to go to work in his father's shingle mill as a packer, was allowed to go to work driving shingle bolts on a creek on the promise that later he could have the packer's job, there being nothing said about compensation; since, in the case of father and minor child, there must be clear proof of a contractual relation.

Same—Relation—Lawful Employment—Workmen's Compensation. To obtain compensation under Rem. & Bal. Code, § 6570 of the workmen's compensation act, prohibiting the employment of persons under fourteen years of age, without permission of the superior court, it is incumbent upon the claimant to show that a child under fourteen years of age was employed lawfully; and, in the absence of proof of permission, violation of the law will be presumed.

Same—Relation—Employment—Workmen's Compensation Act. Under Rem. & Bal. Code, § 6570, providing that no person under fourteen years of age shall be "hired" out to labor in any factory, mill, workshop, or store," the statute is violated and no recovery can be had under the workmen's compensation act, where a boy of thirteen was drowned in a creek about eighty rods from a shingle mill, while engaged in driving shingle bolts to the mill; since the creek was in a sense a part of the machinery of the mill, as a conveyor, and the boy was engaged "in the mill" to the same extent that he would have been if putting bolts on the slip of the mill.

Gose, Parker, and Ellis, JJ., dissent.

Appeal from a judgment of the superior court for Whatcom county, Hardin, J., entered September 22, 1913, upon the verdict of a jury rendered in favor of the plaintiffs, in

[1]Reported in 141 Pac. 913.

an action for the death of a son, on appeal from a ruling of the industrial insurance commission. Reversed.

*The Attorney General* and *John M. Wilson, Assistant,* for appellant.

*Walter B. Whitcomb,* for respondents.

CHADWICK, J.—Respondents owned and operated a shingle mill in Whatcom county, to which they brought shingle bolts by floating them down a creek on which the mill was situated. The deceased minor son of respondents lost his life about eighty rods from the mill while engaged as a workman in their business. The situation and condition attending the employment and the accident are fairly shown by the testimony of Isaac A. Hillestad:

"Q. Did you have any conversation with Arthur? A. We had several conversations. He wanted to go up there to go to work, and I would not take him out of school. He wanted to go up as soon as I bought the mill and I would not take him out of school. I told him to stay in school until we moved up. Q. When you moved up what took place? A. He wanted to pack, that is what he really came up for, but I had a packer, and so we had some bolts to drive on the creek, and I told him he could go drive them up until that packer got through and then he could take the packing job. Q. Was there anything said about his compensation for any of this? A. No, sir, there was nothing mentioned about that; in fact he did not know much about the compensation. Q. I mean, was anything said about the wages? A. I don't know there was anything in particular. There was a scale of wages around shingle mills that we pay. They know what the wages are. Q. Was there any understanding of any kind between you and him in regard to that subject? A. Why, he was to get his money the same as the rest of them; that was the understanding. If he stayed in Bellingham he wanted to work in the cannery some place in vacation, and I told him if he wanted to work he might as well come up there and work. Q. Did he go to work? A. Yes, he went to work. Q. Do you know what day he went to work? A. I think he went to work on the creek on Saturday and he worked either all of

Saturday or a part of Saturday. Q. What was he doing on the creek? A. He was driving bolts, gathering up some scattering bolts along the creek. Q. How far was this from the mill? A. I guess it was about eighty rods from the mill where it happened."

At the time of the accident, the son was under the age of fourteen years. A claim was filed with the industrial insurance commission and was by it rejected, upon two grounds: First, that no contract of employment had been shown; and second, that the boy was working in the mill in violation of the provisions of Rem. & Bal. Code, § 6570 (P. C. 291 § 151). An appeal was taken to the superior court where the case was tried by the court with a jury, and a verdict was returned in favor of the respondents. The case is brought to this court by the industrial insurance commission for review.

It is contended by the *Attorney General* that the trial court erred in refusing to take the case from the jury, and decide, as a matter of law, that the evidence was insufficient to support a recovery by the respondents. He contends that, although a child may be emancipated and may contract in his own right with a father, notwithstanding, the law is that the proof of such unusual employment must be clear and convincing.

We think there can be no doubt of this premise, but the principles of the common law can be of little assistance to us in measuring the right of a workman to claim compensation under the industrial insurance law. It is the purpose of that law to compel the industries of the state to bear the burden of accidents occurring in their operation, and being in derogation of the common law, it cannot be construed so as to include those who do not, by words or necessary implication, come within its terms.

A workman is defined to be "every person in this state, who, after September 30, 1911, is engaged in the employment of an employer carrying on or conducting any of the industries

scheduled or classified in section 4." Laws 1911, p. 346, § 3 (3 Rem. & Bal. Code, § 6604-3).

The law in its tenor and terms contemplates that the relation between employer and employee shall possess some element of certainty. It implies, if indeed it does not literally provide, that there shall be an actual contractual relation between the parties—that is, an agreement to labor for an agreed wage or compensation. The tax put upon an industry is determined by the pay roll. In section 4 of the act it is provided:

"In computing the pay-roll the entire compensation received by every workman employed in extrahazardous employment shall be included, whether it be in the form of salary, wage, piece work, overtime, or any allowance in the way of profit-sharing, premium or otherwise, and whether payable in money, board, or otherwise." (3 Rem. & Bal. Code, § 6604-4).

We cannot make ourselves believe that there was ever any idea of a contract between the father and the son in this case. We have here a thirteen year old boy. He was anxious to work, as many boys of that age may be. The father admits that there was nothing said about compensation. "In fact, he (the boy) did not know much about compensation." The fact that there was a scale of wages around shingle mills and "they know what the wages are," is no proof that even a father would impliedly agree to pay a thirteen year old boy the full wages of a man, granting that the boy knew the scale and expected that wage. If the son had been a stranger and the question of contract, express or implied, had been raised, respondents might contend, and successfully so, that the contract of employment was wanting in some of its essential elements.

Aside from this, granting the full force of the contention made by respondents, it may well be doubted whether he had begun his work under the contract. He was to take a packer's job and that was not open to him at the time. If the

father, as he had a right to do, directed his child to go out and perform some active labor pending the time when his employment would begin, and which was consistent with the usual direction of a father to a son, it should not be held that the case falls under a special statute designed for a special purpose. Or, to state the proposition in another way, had the son been injured and brought an action against his father and the father was bound to pay under the terms of the compensation law, rather than under the principles of the common law, he could successfully defend the case and rest upon his common law right to direct the labors and energies of his child. The view point of the respondents is not a necessary implication of a statute hostile to the common law, and under well settled rules of statutory construction, cannot be held to be controlling.

If a father is going to insist that the child is a workman, he should be bound by the same rule that the law puts upon one who is of full age, and in the absence of clear proof of a contractual relation, we are disposed to hold that a father who puts his child to work at a hazardous employment assumes the risk attending such employment. This argument is met by counsel for respondent, who says that such a holding would deny a father, the owner of a business or a factory, the right to depend upon the labor of his sons. That case is not before us. We are not holding that a son cannot contract with his father, or be a workman under the compensation law. We are going no further than to hold that, under the facts in this case, the boy was not a workman within the meaning of the law.

The judgment of the lower court must be reversed for another reason. Granting there was a contract, the boy was employed in violation of Rem. & Bal. Code, § 6570 (P. C. 291 § 151), which is as follows:

"No person under the age of nineteen years shall be employed as a public messenger by any person, telegraph com-

pany, telephone company, or messenger company in any city of the first class in this state, nor shall any child of either sex under the age of fourteen years be hired out to labor in any factory, mill, workshop or store at any time."

*Murphy v. Bennett*, 11 App. Div. 298, 42 N. Y. Supp. 61, is relied on by respondents. In that case it was held that a boy who was engaged in taking lumber from a pile, the lumber to be carried to and manufactured in an adjacent mill or factory, was not employed in a manufacturing establishment. This case is cited, but not discussed, in Labatt on Master and Servant, §§ 5043, 5924, and 5929, and 22 Cyc. 526. It is the judgment of the writer of this opinion that the case is not sound and should not be followed. If we were to do so, we would violate the spirit and purpose of the child labor law. The reasoning which would sustain a holding that a child who takes a board off of a pile and carries it to the door of the mill, there to be manufactured, is not engaged in the mill, and the boy who receives it at the door to be carried to the planer, is engaged in the mill, is altogether too refined, when we take into consideration the objects, purposes and humane spirit of the law. The object of the law is three-fold: to prevent persons of immature judgment from engaging in hazardous occupations; to prevent employment and overwork of children during the period of their mental and physical development; and to prevent, so far as the law is able to prevent it, a competition between weak and under-paid labor and mature men who owe to society the obligations and duties of citizenship. The New York case is not in accord with the spirit of the case of *Wendt v. Industrial Insurance Commission, ante* p. 111, 141 Pac. 311. The case is so recent that it must be familiar and we will not restate the facts. It is there said:

"If the employer conducts any department of his business, whether large or small, as an extra hazardous business within the meaning and defined terms of this [industrial insurance

law] act, his workmen would come within the class designated by the act, and be entitled to the protection of the act."

Floating bolts to the mill is a department or a part of the manufacturing of shingles.

In the case of *Casey v. Barber Asphalt Pav. Co.*, 202 Fed. 1, the district court held that a paving plant erected and operated on a car and moved from place to place was not a "factory, or work-shop and was to be likened to a threshing machine, a steam shovel, a wrecking car, and other similar machines and appliances, and to the small concrete and asphalt mixers which are frequently seen in use upon the streets of cities and towns." The circuit court of appeals said that it did not understand that a house is an absolutely essential element of either factory or mill. While the soundness of the circuit court's judgment in that case may be doubted, yet its reasoning seems to us to be applicable to the case at bar. Moreover, our statute is, as was the New York statute, very much broader in its concept than the usual definition of a mill, workshop or factory. Ordinarily, a mill or factory includes buildings or premises within a certain close where mechanical power is used to work and move machinery. Black's Law Dictionary, Title, "Factory" and the factory acts in many of the states have so defined mills and factories. They are so defined in §§ 2 and 3 of the industrial insurance law. The New York case was evidently decided with this definition in mind, whereas, our child labor law makes no such limitation, but adopts a definition as broad as the spirit of the act.

Counsel for respondents is of the opinion that this defense is not available to the appellant for the reason that the record is silent as to whether the superior judge had given permission to the minor to work in the mill. To effectuate the intention and purposes of § 6570, it is necessary that we hold that one who employs a child under the age of fourteen years should be prepared in all cases to show that the child is employed lawfully. In the absence of such showing, the law

will presume that the employment is in violation of a pro-
hibitory statute. The fact that the boy was engaged at a
place eighty rods from the mill would not change the rule.
The stream was, in a sense, a part of the machinery of the
mill, just as much as a conveyor or elevator would have been,
and it cannot make any more difference whether the boy was
drowned while moving bolts eighty rods away than it would
if he were moving them eight rods away, or was about to put
them on the slip of the mill.

It is contended by respondents that this rule can have no
application in this case for the reason that there is no causa-
tive connection between the violation of the law and the
death of the boy, under the authority of the following cases:
*Bloom v. Franklin Life Ins. Co.*, 97 Ind. 478, 49 Am. Rep.
469; *Harnden v. Milwaukee Mechanics' Ins. Co.*, 164 Mass.
382, 49 Am. St. 467; *Conboy v. Railway Officials etc. Ass'n*,
17 Ind. App. 62, 60 Am. St. 154. In the *Bloom* case, it was
said:

"There must in all cases, whether the law violated be a
criminal one or a civil one, be some causative connection be-
tween the act which constituted the violation of the law and
the death of the assured. A man engaged in uttering coun-
terfeit money might meet his death while so engaged, and
yet there might be circumstances which would destroy the
causal connection between the death and the violation of the
law, and in such a case it is clear that a company would not
be relieved from liability."

That rule would apply if this action were a common law
action and brought by the father of the boy against a third
person. It has no application in a case brought against the
industrial insurance commission to compel a payment out
of the accident fund. The industrial insurance commission
owes no primary duty to an employee or a workman in any
industry. It is not answerable as for negligence. Had the
boy been injured, granting his emancipation, he might have
sued his father and recovered under the rule invoked; but
here the father is suing the state and asking payment out of

a fund contributed by the industries of the state and is pleading his own negligence. The burden of meeting the consequences of the injury to workmen is put upon the industry, but the state has not assumed a statutory duty to reimburse the father for the loss of the services of the son who has been employed by him in violation of a positive and equally meritorious statute.

For these reasons, the judgment of the superior court is reversed, and the action is remanded with instructions to dismiss.

CROW, C. J., FULLERTON, MORRIS, MOUNT, and MAIN, JJ., concur.

GOSE, J. (dissenting)—A minor son of the respondents fell from a raft and was drowned while engaged in collecting shingle bolts for them. He was working about eighty rods from the mill at the time he was drowned. Section 3 of the industrial insurance act provides:

"Workman means every person in this state, who after September 30, 1911, is engaged in the employment of an employer carrying on or conducting any of the industries scheduled or classified in section 4, whether by way of manual labor or otherwise, and whether upon the premises or at the plant or, he being in the course of his employment, away from the plant of his employer." 3 Rem. & Bal. Code, § 6604-3.

The purpose of the law is to guarantee protection to those working in the industries covered by the act. I think the words "engaged in the employment of an employer," mean those in the service of an employer carrying on or conducting any of the industries embraced in the act. I cannot agree with the majority opinion that the term implies that there shall be an actual contract relation between the parties. That construction is not in accord with the humane purpose of the law, and to my mind is an unsound interpretation of the statute. Nor is it important that the boy had not actually commenced work as a packer. He was engaged in the service of an employer who was conducting an industry em--

braced within the act.   In other words, he was working for him "away from the plant."   Whether he did or did not receive a salary is, to my mind, beside the question.

Nor am I able to comprehend how he was "hired out to labor in any factory, mill, workshop, or store."   He was not working there at the time he met his death, but eighty rods distant, upon a raft in a stream, gathering shingle bolts which had been stranded, for the purpose of causing them to float to the mill.   The fact that he was intending to work as a packer in the mill at some subsequent time, however soon, does not bring him within the prohibition of the statute. Considering the humane purpose of the law, it seems to me that he was a workman within its meaning, and that he was not working in a factory, mill, or workshop.   I therefore dissent.

PARKER and ELLIS, JJ., concur with GOSE, J.