[No. 28081. Department One. January 27, 1941.]

AMERICAN PRODUCTS COMPANY, *Appellant,* v. EMIL VILLWOCK *et al., Respondents.*[1]

[1]Reported in 109 P. (2d) 570.

248

*Cheney & Hutcheson* and *John Gavin,* for appellant.

*Roberts, Swanson & Tunstall,* for respondents.

STEINERT, J.—This action is the sequel to a collision between two automobile trucks. Plaintiffs, American Products Co. and Frank Thompson, the owner and the driver, respectively, of one of the trucks, instituted the action jointly to recover damages for the impairment of that truck and for the injuries sustained by its driver. Defendant Emil Villwock, owner of the other truck, acting both in his individual capacity and as guardian *ad litem* for his minor son, defendant Charles Villwock, filed a cross-complaint, seeking to recover damages for the demolition of that truck and for the injuries sustained by the son, the driver thereof.

The action was tried to a jury and resulted in verdicts awarding damages to defendants. Plaintiffs interposed motions for judgment notwithstanding the verdicts and for a new trial. Defendants having consented to a reduction of one of the verdicts, in an amount designated by the court, both motions of plaintiffs were denied, and judgment was entered accordingly. From that judgment, plaintiff American Products Co., alone, has appealed, and will hereinafter be referred to as appellant; defendants will be referred to as respondents.

Appellant, a corporation, was engaged in the business of collecting and processing dead animals and utilizing the by-products obtained therefrom. In the conduct of its business, it sent out its trucks into the neighboring territory to gather up carcasses and fractional parts thereof and bring them to its processing plant in Yakima for treatment.

Respondent Emil Villwock was engaged in business in, or near, Yakima, under the name of Naches Fuel & Feed Company, and, in connection with that business,

bought and sold farm produce, shipments of which he at times forwarded by truck to the market in and around Seattle. His son, respondent Charles Villwock, eighteen years of age, drove for him during the summer of 1939, as he had previously done during a year when he remained out of school. In the course of such employment, the son had made about thirty round trips from Yakima to the coast, hauling produce in one of his father's trucks.

State Highway No. 3, leading from Yakima to Ellensburg, is a paved road having four lanes of travel for a distance of about five miles immediately north of Yakima and until it reaches a road diverting to the west across the Selah bridge. From that point on, toward the north, the state highway is a two-lane road having a width of from twenty to twenty-two feet, and marked with a yellow line along the middle.

Approaching the Selah road from both directions, the paved highway describes a long, sweeping curve, a quarter of a mile or more in length, which bends to the right as one comes from the direction of Yakima. The most abrupt portion of the curve is about midway of its entire sweep, and is near the point where the Selah road diverts. From one end of the curve to the other, the highway effects a change in direction of approximately ninety degrees. The northerly extremity of the curve is about five hundred feet north of the Selah road. Beyond, or north of, that point, the highway is straight, and runs in a northerly direction. The curve, from the Selah road to its northerly extremity, has an ascending grade of about one per cent.

Along the edge of the pavement on both sides of the highway, and throughout the length of the curve, is a six-foot graveled shoulder. Beyond the shoulder on the east side of the highway is a ditch, and beyond

that, at a distance varying from nine to sixteen feet from the pavement, is a high, almost perpendicular, rock bluff which cuts off the view around the turn. Along the outer edge of the west shoulder of the highway is a guard fence, and just beyond that is the Yakima river.

At the west edge of the highway, at a distance of two hundred or two hundred and fifty feet north of the northerly extremity of the curve, and about seven hundred feet north of the Selah intersection, is a road sign indicating a speed limit of thirty-five miles per hour. At a point on the highway two hundred and twenty feet north of the road sign is what is designated as a "curve sign."

On August 23, 1939, at about 7:50 in the evening, respondent Charles Villwock was driving his father's one and one-half ton Dodge truck in a northerly direction along the above-described curve, en route from Yakima to Bremerton. The truck was loaded with eighty-two bales of hay, weighing approximately five and one-half tons. Twelve of the bales, weighing over three-fourths of a ton, were loaded on a specially constructed platform extending over the cab of the truck. The load was twelve feet in height from the ground, and was about eight feet wide. The equipment as loaded was approximately eighteen feet long and weighed about eight tons. Charles was accompanied at the time by a helper, who was to assist him in unloading the hay at Bremerton.

The highway was dry, and the weather was clear. The evening had reached that point of time described as "dusk," and the lights of the truck were accordingly burning.

At the same time, a 1937 International truck, owned by appellant and driven by plaintiff Frank Thompson, was proceeding south along the highway, towards

Yakima, and was approaching the northerly end of the curve. The truck carried ten 50-gallon barrels of animal intestines, a dead horse, and a dead cow. The equipment as loaded weighed over five tons. The head-lights of that truck were likewise burning at the time. Accompanying Thompson was a young lady, who had joined him at or near Ellensburg and who had been with him during the afternoon while he was collecting his load.

In the vicinity of the road sign just north of the northerly extremity of the curve, the International truck, driven by Thompson, overtook a girl bicyclist who was also riding in a southerly direction on her way to Yakima. The girl wore a loose, light-colored shirt, and brown slacks which were rolled up above her knees. The bicycle was equipped with a lighted flash-light in front, a red reflector in the rear, and had bright chromium fenders.

Approaching the bicycle, Thompson, in an attempt to pass it, pulled sharply to his left, onto the east lane of travel, and, after proceeding straight forward some distance in the east lane, pulled sharply to his right, intending to gain a place in the west lane, ahead of the bicycle. In the meantime, the Villwock truck had con-tinued forward around the curve, in its proper lane, to a point near the northerly extremity of the curve. Thompson, on seeing the approaching truck ahead of him in the east lane, attempted to get over onto his own proper lane, and managed, by speeding up, to get the front wheels of his truck across the yellow center line, but the main body of his vehicle was still in the east lane when it was struck with great force by the front end of the Villwock truck, which was then pro-ceeding along its own right side of the road.

As a result of the collision, both trucks came to an immediate stop, with the front wheels of appellant's

truck resting in the west lane of travel, the right front wheel of respondents' truck extending about a foot onto the east shoulder of the road, and the remaining portions of both trucks resting in the east lane of travel, in angling positions, facing in opposite directions. The Villwock truck received the greater damage, amounting almost to demolition. The hay was strewn upon the highway, and the intestines, which had been contained in barrels in appellant's truck, were emitted in a general shower, ruining a considerable portion of the hay. Thompson received minor injuries, and Charles Villwock received severe injuries, as will be shown later. The two companions of the drivers escaped unhurt.

We have thus far given only a general outline of the evidence. Further details will be supplied in connection with our discussion of the legal questions raised.

The verdicts reflect the jury's view of the proximate cause of the collision and of the amount of damages sustained by respondents.

Appellant, being thoroughly dissatisfied with the verdicts and the judgment, invokes relief from this court, and in its brief sets up thirteen questions under a "Statement of Questions Involved" covering four and one-half pages (the rules of this court specify that two pages shall be the limit, Rules of the Supreme Court, Rule XVI, 193 Wash. 23-a), and lists sixteen assignments of error, predicated upon a transcript containing fifty-four pages and a statement of facts comprising three hundred and ninety-three pages. We mention these matters merely in justification of the length to which this opinion will be required to go in order to dispose of the many questions raised, although, for the most part, nothing other than well settled principles of law will be presented.

According to appellant's summary of its assignments of error, the following propositions are advanced: (1) That the evidence falls far short of convicting appellant of any negligence; (2) that it affirmatively appears, beyond any dispute, that respondents were guilty of contributory negligence; (3) that respondent Charles Villwock is barred from recovery by the provisions of the workmen's compensation act; (4) that the award for personal injuries sustained by Charles Villwock is grossly excessive; (5) that eight of the instructions given by the trial court are palpably erroneous; (6) that the failure of the court to give three instructions requested by appellant constituted reversible error; and (7) that the court erred in admitting evidence of an experiment conducted after the collision. We shall discuss these questions in their order.

In considering the first question, the following rule, frequently announced by this court, must be kept in mind: A challenge to the sufficiency of the evidence admits the truth of plaintiff's (or cross-complainant's) evidence and all inferences that reasonably can be drawn therefrom, and requires that the evidence be interpreted most strongly against the defendant (or cross-defendant) and in the light most favorable to plaintiff (or cross-complainant). *Beck v. Dye,* 200 Wash. 1, 92 P. (2d) 1113; *Rice v. Garl,* 2 Wn. (2d) 403, 98 P. (2d) 301; *Lindberg v. Steele,* 5 Wn. (2d) 54, 104 P. (2d) 940.

In the light of that rule, the evidence was ample to warrant the jury in finding that plaintiff, Frank Thompson, while proceeding down the straightaway, had a view of the girl bicyclist for a distance of at least two hundred feet ahead of him; that he could easily have brought his truck to a stop within that distance

had he been traveling at a reasonable rate of speed under the circumstances; that the girl was riding on the extreme edge of the west side of the pavement; that Thompson would have had no difficulty in passing her on the west lane, as other vehicles had done that same evening, without swerving his truck onto the east lane of the highway; that, by reason of his inattention, Thompson failed to see the girl until he was within fifty or seventy-five feet of her, and that he then suddenly swerved to his left at a time when his course would bring him within the curve around which respondents' truck was proceeding in a proper manner; and, finally, that Thompson had ample time, after passing the bicycle, to regain his proper side of the road without colliding with respondents' truck.

It is true that appellant's evidence would have supported findings to the contrary; but where, on controverted questions of fact, there is evidence, or there are justifiable inferences from evidence, upon which reasonable minds might reach different conclusions, the questions are for the jury, and not for the court, to decide. *Beck v. Dye,* 200 Wash. 1, 92 P. (2d) 1113.

Appellant's principal contention, under the first proposition advanced by it, is that its driver was faced with an emergency, was compelled to act instinctively, and therefore should not be charged with negligence even though he may have committed an error of judgment. Appellant cites, as authority for its contention, a portion of the language contained in 1 Blashfield, Cyclopedia of Automobile Law and Practice (Perm. ed.), 476, § 668, as follows:

"When one is confronted with a sudden peril requiring instinctive action, he is not, in determining his course of action, held to the exercise of the same degree of care as when he has time for reflection."

There can be no doubt but that such is the rule in this state. *Ritter v. Johnson,* 163 Wash. 153, 300 Pac. 518, 79 A. L. R. 1270.

However, the rule above quoted has its qualification, as appears in the very next section of the legal treatise cited by appellant, as follows:

"The rule of sudden emergency as above stated cannot be invoked by one who has brought that emergency upon himself by his own wrong or who has not used due care to avoid it." 1 Blashfield, Cyclopedia of Automobile Law and Practice (Perm. ed.), 480, § 669.

We have likewise declared and followed that exception to the general rule. *Ritter v. Johnson,* 163 Wash. 153, 300 Pac. 518, 79 A. L. R. 1270; *Barcott v. Standring,* 163 Wash. 357, 1 P. (2d) 213; *Mercer v. Lovering,* 170 Wash. 140, 15 P. (2d) 930.

Whether or not Thompson was proceeding with reasonable care when confronted with an emergency, and, if so, whether or not he thereafter acted as a reasonably prudent man, were, under the evidence, questions for the jury. *Lawe v. Seattle,* 163 Wash. 362, 1 P. (2d) 237. In our opinion, the evidence was clearly sufficient to warrant the jury in finding that Thompson was guilty of negligence, and that his negligence was the proximate cause of respondents' damages.

We proceed next to the question of contributory negligence. That issue is ordinarily one within the province of the jury to determine, and the court is not justified in taking that question from the jury, unless the conduct of the party charged with contributory negligence was so palpably negligent as to preclude the possibility of a difference of opinion concerning it. *Bender v. White,* 199 Wash. 510, 92 P. (2d) 268.

Viewing the evidence in the light most favor-

able to respondents, as the jury had the right to do, it could well have found the facts, with respect to the conduct of the respondent driver, to have been as follows: As Charles Villwock came into the portion of the turn near the Selah road, he slowed down to eighteen miles an hour and shifted into third gear (his truck was equipped with four speeds forward). He proceeded in third gear, increasing his speed to approximately twenty-three miles per hour, until he was almost out of that segment of the turn. While still in third gear, he observed upon the guard fence on the opposite side of the road the reflection of the lights of an oncoming vehicle, and immediately thereafter the headlights of appellant's truck came into view, at a distance of from two hundred to four hundred feet ahead. About the same time, Charles also observed the bicycle in the west lane of the road. He proceeded in his course, however, traveling at a proper rate of speed, and at a distance of about a foot from the easterly edge of the pavement. When the oncoming truck reached a point about fifty to seventy-five feet north of Charles, and while it was still on its own right side of the road, it suddenly swerved to its left to pass the bicycle, and came over onto the wrong side of the highway and onto the lane in which Charles was traveling. Charles applied his brakes, not with full force, but gradually. The reason for not at once applying his brakes fully was that he would have thereby run the risk of upsetting his truck. When the oncoming truck reached a point about forty feet directly ahead of him, Charles turned his steering wheel sharply to the right, and endeavored to maneuver his truck onto the graveled shoulder. He was unable, however, to avoid the collision, which occurred almost instantly. At the time of the impact, the truck which Charles was

driving was moving at the rate of about fifteen miles per hour.

In our opinion, it requires no argument to convince anyone that, on the basis of the factual situation above set forth, the jury was fully warranted in holding that Charles was not guilty of contributory negligence. In any event, we could not hold, upon such evidence, that contributory negligence had been established as a matter of law.

In this connection, appellant relies upon a number of our cases which hold "that a driver cannot persist in asserting the rule of the road when he knows, or should know, that to do so would result in a collision." We concede the validity of that rule under proper circumstances, but we do not think that it is applicable to the present situation as a matter of law.

The instant case differs from those cited by appellant in that, viewing the evidence in the light most favorable to respondents, the jury was warranted in finding that Charles did not know, nor at the time ought to have known, that to assert the rule of the road would result in a collision. In each of the cases relied upon by appellant, the driver against whom the rule was applied was in some manner warned of the danger. Either the oncoming car was obviously and continuously proceeding in a reckless manner, or the other side of the road was blocked. In the case at bar, the jury was entitled to find from the evidence that, when Charles first observed the oncoming truck, he thought, and had reason to believe, that the truck, in passing the bicycle, could, and would, stay on its own side of the road; that, when appellant's truck swerved onto the left side of the road, Charles still had reason to believe that it would immediately resume its proper lane; and that, when the oncoming truck persisted in its course, and when Charles realized

that a collision was imminent, he did everything that he could to avoid it.

Furthermore, whether or not Charles might sooner have turned in one direction or another, or might sooner have brought his truck to a sudden stop, the jury was warranted in believing that Charles, and not plaintiff Thompson, was faced with an emergency not of his own making, and that he acted as a reasonably prudent man would have done under the circumstances.

"One driving an automobile along a public highway who sees a car approaching on the wrong side of the road has a right to assume that the driver thereof will observe the law of the road and seasonably turn over to the right, and he may proceed upon this assumption until he sees or, in the exercise of ordinary care ought to see, that his assumption is unwarranted. . . .

"Whether such an emergency existed as justified the appellant in turning to the left [appellant there first turned to his left, then to his right, attempting to avoid a collision] to avoid an accident, and whether under this emergency the respondent acted with due prudence, was a question of fact for the jury. The law does not scrutinize too carefully an act done by one who has been put in a position of danger by one who inflicts injury upon him, but leaves it for the jury to say whether, under the circumstances, the act in seeking to avoid the danger was that of an ordinarily prudent man." *Luther v. Pacific Fruit & Produce Co.*, 143 Wash. 308, 255 Pac. 365.

The evidence favorable to respondent in the case at bar was much stronger than was the evidence favorable to the appellant in the *Luther* case, *supra*, and there is no question in our mind but that it was clearly for the jury to say whether or not Charles was guilty of contributory negligence.

Appellant's third contention is that the workmen's compensation act of this state has abolished any cause of action which respondents might otherwise have had for the alleged injuries sustained by Charles.

That question was not raised in the trial court until after the verdicts had been returned. It is true that, in the introductory paragraphs of their complaint, appellant and plaintiff Thompson alleged that the two trucks were being operated, at the time of the collision, by Frank Thompson and Charles Villwock, respectively, as *employees* of the respective owners of the trucks. It is also true that respondents in their answer "admitted" that allegation. It is apparent, however, from the entire pleadings, as well as from the evidence, that the term "employees" was used in the complaint solely for the purpose of pleading the status of the drivers as agents of their employers, and not at all for the purpose of invoking the inhibition of the workmen's compensation act. Were that not true, plaintiff Frank Thompson would by his own allegation have pleaded himself out of court, upon the basis of the very contention that his coplaintiff, appellant, now makes. Furthermore, plaintiffs did not move for judgment on the pleadings as to Charles Villwock's alleged cause of action, nor did they at any time prior to the submission of the case to the jury challenge the sufficiency of the evidence on the ground now urged.

The theory upon which the case was tried by all parties, and upon which the jury was instructed at the instance of the same parties, was that the action constituted simply a common law action for negligence. All the evidence, which comprises 383 pages of the statement of facts, with the exception of not more than six lines hereinafter noted, was directed to just two questions: (1) The negligence of the respective drivers, and (2) the extent of the injuries sustained.

It was only after the return of the verdicts adverse to them that appellant and plaintiff Thompson, through argument on their motions for judgment notwithstanding the verdicts and for a new trial, fell upon

the contention that is now so strenuously urged in appellant's brief. Appellant's failure to present that question to the trial court at the proper time, and in the proper way, should, alone, be sufficient to dispose of appellant's contention. Since, however, the briefs, overlooking that consideration, treat appellant's present assignment of error as though properly presented, we shall not rest our conclusion upon the suggestion that we have just made, but will consider the assignment on the basis of its inherent merit.

Appellant's position is, first, that the character of work in which Frank Thompson and Charles Villwock, the two truck drivers, were each engaged at the time of the collision, came within the workmen's compensation act by virtue of Rem. Rev. Stat. (Sup.), § 7674 [P. C. § 3469], which includes as extrahazardous employment

". . . teaming, truck driving and motor delivery, including drivers and helpers, in connection with any occupation except agriculture; . . ." Laws of 1939, chapter 41, p. 119, § 1.

and, second, that appellant, also, came within the act by virtue of its business of processing dead animals. We will assume, without deciding, that appellant's position in those respects is correct.

Appellant next calls our attention to the statute providing, and to the cases holding, that no action may be brought by a workman who is under the act against a third party employer or workman who is likewise under the act, if at the time of the accident such third party employer or workman "was in the course of any extrahazardous employment." The statute and citations relied on are: Rem. Rev. Stat. (Sup.), § 7675 [P. C. § 3470], Laws of 1939, chapter 41, p. 121, § 2; *Robinson v. McHugh,* 158 Wash. 157, 291 Pac. 330; *Denning v. Quist,* 160 Wash. 681, 296 Pac.

145; *Weiffenbach v. Seattle*, 193 Wash. 528, 76 P. (2d) 589.

 Accepting appellant's premises, we have the task of determining whether or not, under the evidence presented by the record, Charles Villwock must be held to be a "workman" within the meaning of that act. The term "workman" is defined by Rem. Rev. Stat. (Sup.), § 7675, as

" . . . every person in this state, who is engaged in the employment of any employer coming under this act whether by way of manual labor or otherwise, in the course of his employment."

An "employer" is defined as meaning, except where otherwise expressly stated,

" . . . any person, body of persons, corporate or otherwise, . . . all while engaged in this state in any extra-hazardous work, by way of trade or business, or who contracts with one or more workmen, the essence of which is the personal labor of such workman or workmen, in extra-hazardous work."

The only evidence in the record upon which the status of Charles Villwock as a "workman" under the statute could be predicated, is the following testimony given by respondent Emil Villwock, the father, upon direct examination:

"Q. Charles has driven for you considerably? A. Yes sir. Q. He does that as a son or do you pay him for driving? A. Yes sir. Q. You do pay him? A. *Yes, I pay him wages the same as I would pay a man.*" (Italics ours.)

The sole basis for appellant's contention is the answer given to the last question, the sentence which we have italicized.

It may be stated, at this point, that the foregoing questions and answers were a part of the father's testimony relating directly and exclusively to the fitness

and ability of Charles to drive the particular truck upon the occasion in question. It may also be pointed out that appellant did not, upon cross-examination or otherwise, attempt to elicit any information concerning Charles' status as a "workman" under the statute. It may be observed further that it is not wholly clear whether the father, in making the answer italicized above, meant that he paid his son, although only a boy, the same *amount* of wages that he would have been required to pay a man for that work, or whether he meant that he paid the boy wages *in the same manner* that he would pay an adult who was not a member of his immediate family, that is, pursuant to a legally enforcible contract of employment. Certainly, the answer does not conclusively establish that the father regarded, or that he must be held to have regarded, the boy as a "workman" in the sense contemplated by the workmen's compensation act, rather than as one over whom he exercised parental control, even though he did pay him wages.

The question with which we are presently concerned has been considered in two of our former decisions, in each of which an effort was made by, or on behalf of, an injured minor to obtain compensation under the workmen's compensation act. In *Hillestad v. Industrial Ins. Commission,* 80 Wash. 426, 141 Pac. 913, Ann. Cas. 1916B, 789, a boy thirteen years of age lost his life while engaged as a workman in his father's business. On the question of the son's status, the father testified in part:

"Q. Was there anything said about his compensation for any of this? A. No, sir, there was nothing mentioned about that; in fact he did not know much about the compensation. Q. I mean, was anything said about the wages? A. I don't know there was anything in particular. There was a scale of wages around shingle mills that we pay. They know what the wages

are. Q. *Was there any understanding of any kind between you and him in regard to that subject.* A. *Why, he was to get his money the same as the rest of them; that was the understanding."* (Italics ours.)

In holding that the deceased minor son was not an "employee" within the meaning of the workmen's compensation act, this court said:

"The law in its tenor and terms contemplates that the relation between employer and employee shall possess some element of certainty. It implies, if indeed it does not literally provide, that there shall be *an actual contractual relation between the parties*—that is, an agreement to labor for an agreed wage or compensation." (Italics ours.)

It will be seen that the factual situation with reference to the payment of wages in that case was practically the same as that in the instant case. If anything, the testimony in the *Hillestad* case, in referring to "the understanding," comes closer to furnishing the necessary contractual element required by the holding of that case than does the testimony in the case at bar, which made no reference to any agreement or understanding. It must be conceded, however, that the *Hillestad* case presented a weaker element than does the instant one, in that there the minor was but thirteen years of age, which was below the age of legal employment without the sanction of the court, while here the minor was eighteen years of age, and, under the law, could be legally employed. On the other hand, the youth involved in the *Hillestad* case had apparently quit his school education and contemplated permanent employment in his father's enterprise. That was not the situation here; Charles Villwock was planning to continue his school education at the time that he was injured. In any event, even if the *Hillestad* case be considered as not wholly controlling of this

case, it is nevertheless authority for two propositions: (1) There must be *an actual contractual relationship between the parties,* and (2) the proof of such contractual relationship must be clear and convincing.

In *Cheney v. Department of Labor & Industries,* 175 Wash. 60, 26 P. (2d) 393, upon which appellant relies confidently, a boy sixteen years of age was injured while working with a crew of men in his father's mill. In holding that the boy was entitled to recover industrial insurance compensation, this court said:

"The first question is whether the claimant was an employee under the workmen's compensation act. He and his father both distinctly testified that there was an express agreement between them, made before he went to work, that he was to receive $2.50 per day and board, the same as the other employees, and *that he could use the money which he earned in any manner that he pleased.* This testimony is sustained by Mrs. Cheney, the wife of E. M. Cheney and the mother of the claimant. If the testimony is to be believed there was an *express agreement between father and son* that the latter should be employed at $2.50 a day and board, and *that the son could use the money as he saw fit."* (Italics ours.)

The court pointed out that, in the *Hillestad* case, *supra,* the employment of the minor by his father was wrongful, under the provisions of Rem. Rev. Stat., § 2447 [P. C. § 8833], while in the case then before the court the employment was not wrongful. The court also distinguished the case then before it from the case of *Aetna Life Ins. Co. v. Industrial Accident Commission,* 175 Cal. 91, 165 Pac. 15, L. R. A. 1918F, 194, pointing out that, in the California case, there was no agreement, as in the *Cheney* case, that the minor "was to receive a fixed compensation which the son could use as he saw fit."

The logic and the effect of the *Hillestad* case and the *Cheney* case, *supra,* considered together, are, and we

now hold that the law of this state is, that the relationship of employer and employee, between parent and child, springs from contract, and that as between parent and child such contract, in order to be valid, must provide that the child shall receive for the labor performed by him a fixed compensation which he may use as he sees fit, and that the proof of such contractual relationship must be clear and convincing.

Furthermore, appellant's contention amounts to what, under a proper pleading, would have constituted a plea by him in bar of recovery by respondents. Upon such issue, of course, the burden of proof would have been upon appellant. In the case at bar, we have but a brief, isolated remark, indicating, at most, that the father paid the son a wage. It can hardly be said that this constitutes clear and convincing proof that the father and the son had entered into a contract of employment under the terms of which the son was to receive for his services a fixed compensation which he could use as he saw fit.

It is the law of this state, as elsewhere, that, during the minority of a child, the parents are legally entitled to his earnings unless there has been an emancipation of the child. *Daly v. Everett Pulp & Paper Co.*, 31 Wash. 252, 71 Pac. 1014; *Dean v. Oregon R. & Nav. Co.*, 44 Wash. 564, 87 Pac. 824; Madden, Domestic Relations, 403, § 120.

Emancipation, however, whether express or implied, complete or partial, absolute or conditional, is never presumed, but must be clearly proved, and the burden of proof rests upon the one alleging such emancipation.

" 'Emancipation' of a child is the relinquishment by the parent of control and authority over the child, conferring on him the right to his earnings and terminating the parent's legal duty to support the child. It may be express, as by voluntary agreement of parent and child, or implied from such acts and conduct as

import consent; it may be conditional or absolute, complete or partial. The emancipation of a minor is not to be presumed and must be proved; and the burden of proof is on the father claiming immunity because of it. This doctrine of emancipation is peculiarly favored where both the child and parent invoke it in order to protect the minor's earnings against the unfortunate parent's creditors." 1 Schouler, Domestic Relations (6th ed.), 897, § 807.

In the case at bar, neither the minor nor the parent seeks to invoke the doctrine; on the contrary, they jointly resist its application.

There is not in the record before us a word of proof that Charles Villwock had been emancipated, in whole or in part, by his father. There is only the inference that might be drawn from the fact that the father had paid the son wages. While that fact may be an element to be taken into consideration in determining the ultimate question, it does not of itself establish emancipation. A father might, for one or another of many reasons, pay his son wages without having the slightest intention of emancipating him. The right, as well as the duty, to exercise parental control and to provide parental care and support, is of such paramount importance and necessity, and is so thoroughly recognized in law and by society in general, that any divestiture of that right and that duty must be proved by evidence that is clear, cogent, and convincing.

■ If there be no emancipation of the child, there can be no basis for a contractual relationship between the parent and the child, and, accordingly, if the proof offered to show a contractual relationship be insufficient to establish at the same time an accompanying emancipation, it will not be sufficient to establish the contract. Since, in our opinion, the proof in the case at bar failed to establish emancipation, the fact that

the father paid the son wages had no further signifi-
cance.

■ We are mindful of the fact, upon which ap-
pellant so strongly relies, that Rem. Rev. Stat., § 7680
[P. C. § 3473], provides that a minor working at an
age legally permitted under the laws of the state shall
be deemed *sui juris* for the purpose of the workmen's
compensation act. However, a minor, although he be
considered *"sui juris"* for the purpose of that act, must
nevertheless also be a "workman," as that term is used
in the statute. In other words, there must be a con-
tractual relationship of employer and employee, or
master and servant, in order to make the act appli-
cable at all. As already shown, the evidence in this case
was not sufficient to establish that relationship, and
hence Rem. Rev. Stat., § 7680, has no application.

We hold, therefore, that, under the showing made in
this case, the workmen's compensation act did not
abolish Charles Villwock's cause of action.

■ Appellant contends next that the verdict of
the jury, awarding Charles Villwock three thousand
dollars for personal injuries, is grossly excessive. Dis-
cussing the various injuries separately, appellant con-
cludes that each was of inconsiderable extent and of
a purely temporary nature. It reasons, therefore,
that the verdict was the result of passion and prejudice.

As a result of the impact, Charles was pinned in the
cab of his truck, and, on being released, was found
to be bleeding profusely. He suffered a concussion
of the brain, a fracture of the upper jaw, the disloca-
tion of his nose, a cut which went completely through
his lower lip, the loosening of three teeth, a cut on one
of his wrists which left the tendons exposed, cuts on
his left arm which required twenty stitches, a sprained
ankle, and numerous minor cuts and bruises. His in-
juries were attended with a great deal of pain. He was

confined in a hospital for ten days, and remained at home for a month before returning to work. There was evidence to the effect that he suffered headaches almost constantly for four weeks, and was still subject to them at the time of the trial, necessitating his remaining out of school; that he would certainly lose one of the injured teeth, and probably the two others also; that his nose had been made slightly crooked and broader than it had been prior to the accident; that the cut on the lip had left a permanent scar and a muscular condition which resulted in a facial distortion on an attempt to smile; and that the movement in his left wrist was restricted, and the grip in that hand weakened.

On the basis of that showing, we are unable to follow appellant's contention that the injuries were inconsiderable or, in all events, temporary, nor can we say that the jury was moved by passion and prejudice in fixing the amount of the award. The verdict may have been liberal, but it does not, in our opinion, exceed the bounds of reasonable compensation to such an extent that it can be declared grossly excessive.

Appellant's next contention is predicated upon the fact that the trial court instructed the jury with reference to the statutory brake requirements, without limiting the application of the instruction to the Villwock truck, and, further, upon the fact that the court refused to give an instruction, proposed by appellant, in which such limitation was included. The claim is made that "there was no evidence that any brake equipment upon the appellant's truck had anything whatsoever to do with causing the accident."

There was direct testimony by a state highway department vehicle inspector that appellant's truck had been inspected on the day of the collision, prior to the time of the accident, and that the inspection had

revealed that the brakes were unsatisfactory, in that they were not equalized. Appellant's driver was aware of that condition. While the extent of the defect, or its practical effect, was not shown, the fact that the driver, Thompson, found it preferable, at the speed that he was then traveling, to swing out onto the wrong side of the road, even though he was then approaching a blind curve, instead of attempting to slow down or stop, presented a jury question as to whether or not the brakes on his truck were "adequate to control the movement" of the truck, as required by statute.

Appellant next complains of the following instruction given by the trial court, pursuant to Rem. Rev. Stat., Vol. 7A, § 6360-79 [P. C. § 2696-837]:

"It is also provided by statute that it shall be unlawful for any person operating any vehicle upon any public highway outside incorporated cities and towns to overtake and pass another vehicle proceeding in the same direction *upon any curve* when the view of the operator of such overtaking vehicle is obstructed or obscured within a distance of eight hundred feet along such highway in the direction in which he is proceeding." (Italics ours.)

Exception was taken to that instruction on the ground that the evidence showed that appellant's truck passed the bicycle while the truck was still upon the straightaway, before it had reached the curve. The contention here is that the statute prohibits passing another vehicle only when the latter is actually *on a curve* and when the view of the overtaking driver is obstructed within a distance of eight hundred feet along the highway in the direction in which he is proceeding.

While the literal language of the statute lends support to appellant's contention, the impracticable, and almost absurd, results that would flow from the con-

struction contended for, indicate clearly that the statute was intended, and should be interpreted, to prohibit the overtaking and passing of other vehicles proceeding in the same direction, not only while actually *upon* a curve, but also while *approaching* any curve, when the view of the operator of the overtaking vehicle is obstructed within a distance of eight hundred feet.

Were appellant's position to be upheld, the result would be that in the case of sharp, right angle turns, where the danger created by passing vehicles would be greatest, the application of the statute would be limited to the few feet in which the highway actually effects its turn; up to the point of such actual turn, drivers approaching the blind curve from opposite directions would be free of the statutory inhibition. The instant case, while it presents a variation from the illustration given, is of the general type that results all too frequently in collisions, and which, in our opinion, the statute was intended to prevent. We therefore hold that Rem. Rev. Stat., Vol. 7A, § 6360-79, is applicable to this case, and that it was proper to give the instruction.

■■■ Appellant next assigns as error the giving of an instruction relating to the operation upon the public highway of a vehicle with defective equipment, the application of the instruction having been limited by the court to appellant's truck. Exception was taken to the instruction on the ground that there was no evidence of any defect in appellant's truck which had any connection with the collision.

The state highway department vehicle inspector testified that, in addition to the defect in the brakes, already mentioned, the wheels of appellant's truck were out of alignment, in that "the front wheels toed out 50," which meant that the vehicle had "a 50 foot slip every mile." Although the witness was unable to

state whether the "slip" would be to the right or to the left, he did testify that such defect would make the vehicle more difficult to steer. The evidence in the case was sufficient to warrant the jury in finding that Thompson's inability to regain his proper side of the road, at the rate he was then traveling, in time to avert the collision, was due in part to the cumbersome and defective condition of the truck.

Error is next assigned upon the giving of an instruction which repeated, in part, the statutory language used in a prior instruction. Appellant claims that the repetition constituted an undue and prejudicial emphasis of the particular statutory requirement.

While unnecessary repetition of instructions is to be avoided, such repetition will not constitute reversible error unless it appears that appellant has been prejudiced thereby and that the furtherance of justice demands a reversal. *Alaska Steamship Co. v. Pacific Coast Gypsum Co.*, 78 Wash. 247, 138 Pac. 875; *Smith v. Bratnober*, 188 Wash. 244, 62 P. (2d) 455. We do not consider the instant case as one presenting such a situation. The instructions were many, numbering thirty-four in all. The two here complained of were distantly separated, and the repetition was obviously inadvertent.

Next, appellant complains because the court instructed the jury that, when a person testifies that he looked and did not see an object which he plainly could have seen, such person will not be heard to say that he looked and did not see. Appellant excepted to the giving of that instruction for the alleged reason that there was no evidence, or inference from evidence, to justify its submission. It is argued that at no time did Thompson testify "that he looked but did not see the bicycle."

The whole theory of appellant's case, however, was that Thompson came upon the girl bicyclist so suddenly and so unexpectedly that his action in crossing over to the wrong side of the road was reasonable. One of the principal facts relied upon by appellant as justifying Thompson's failure to see the bicycle sooner was the "dusk" of the evening. A reasonable inference that might have been drawn from that evidence in favor of appellant, was that Thompson was keeping a proper lookout but was prevented from seeing the bicycle because of the peculiar conditions of visibility. On the other hand, there was much testimony to the effect that, had Thompson been giving proper attention to the road ahead of him, he could have seen the bicycle in plenty of time to avoid striking it, and yet have kept on his own side of the road. The evidence as a whole, upon the matter of visibility and as to Thompson's conduct, clearly justified the giving of the instruction in question.

Appellant's criticism is next leveled at an instruction in which the jury was told that, if it found that respondents were traveling at a lawful rate of speed on their right side of the highway at the time of the collision, the burden would then be upon appellant, if it would be excused of negligence by reason of its getting on the wrong side of the highway, *"to prove to your [the jury's] satisfaction* that it got on the wrong side of the highway and remained thereon until the collision occurred through no negligence of its owner." Appellant takes exception to the portion of the instruction which we have italicized, on the ground that it misplaced the burden of proof.

██ Although an instruction in language almost identical with that contained in the one here given was approved in *Thomas v. Adams,* 174 Wash. 118, 24 P. (2d) 432, we are of the view that such phrases as the

one here involved are not to be encouraged. The degree of proof required in negligence cases is "a preponderance of the evidence."

Furthermore, the burden of proving negligence by a preponderance of the evidence rests upon the party alleging it, and the party charged is not required to assume the burden of proving that he was not negligent, but is only required, in response to a *prima facie* case of negligence made against him, to come forward with evidence excusatory of his negligence. The extent to which he must go in that respect is only to the point of producing evidence sufficient to balance the scales upon that issue. Beyond that point, he is not required to go. The original burden of proving negligence by a preponderance of the evidence remains throughout the case upon the party charging negligence.

However, in the case at bar, the issues were clearly defined by the court, and the instructions are replete with statements to the effect that the respective parties must establish all of the material allegations of their complaints "by a fair preponderance of the evidence," and that the jury's findings were to be based upon such "fair preponderance of the evidence." We have repeatedly held that, although detached expressions in a court's charge, if considered as independent expressions, may possibly be erroneous, yet when the instructions as a whole do not mislead the jury there is no prejudicial error. *Carstens v. Earles,* 26 Wash. 676, 67 Pac. 404; *Childs v. Childs,* 49 Wash. 27, 94 Pac. 660; *Curtis v. Perry,* 171 Wash. 542, 18 P. (2d) 840; *O'Connell v. Home Oil Co.,* 180 Wash. 461, 40 P. (2d) 991. A scrutiny of the instructions as a whole convinces us that the jury was not misled as to the burden of proof on the respective issues, nor as to the degree of proof required to sustain that burden.

Appellant next complains of the fact that an instruction relative to the degree of care to which one is held when confronted with an emergency was not limited in its application to plaintiff Thompson. Appellant's contention is that only Thompson, and not Charles Villwock, was, under the circumstances shown, faced with an emergency, and that therefore Charles Villwock was not entitled to the benefit of the rule announced in the instruction. This contention is, of course, disposed of by what has already been said with regard to appellant's contention that respondents were guilty of contributory negligence as a matter of law.

Appellant excepted to an instruction to the effect that, in assessing damages, the jury could "consider the permanency, *if any*, of his [Charles Villwock's] injuries . . . and the pain and suffering, *if any*, which he will with *reasonable certainty* be called upon to endure in the future . . . " (Italics ours.) The ground upon which the exception was based is, allegedly, that it appeared from the evidence that Charles Villwock was not permanently injured, and that he would not be subjected to pain in the future. This assignment is disposed of by what we have already said in connection with appellant's assignment of error based on the amount of damages awarded for Charles Villwock's injuries.

Appellant finally contends that the court erred in admitting evidence of an experiment which was intended to demonstrate that the girl on the bicycle, on the night of the accident, was visible at a greater distance than that testified to by Thompson and his lady companion.

On the evening of August 28th or 29th, about a week after the accident, Harvey Turner, who had been in the Villwock truck at the time of the collision, accompanied a young girl and one of the attorneys for the

respondents to the place where the accident had oc-
curred. The time of day chosen by them for the ex-
periment was about ten minutes earlier than the time
at which the accident in question had happened. This
was to compensate for the fact that the days were
getting shorter. Weather conditions, however, were
identical. The party of three had with them the same
bicycle that was involved on the former occasion, and
the girl was dressed in the same manner as the
former rider had been. The girl mounted the bicycle,
and, while holding an egg in her hand, proceeded
down the road in the vicinity of the northerly extrem-
ity of the curve. Turner and the attorney followed in
an automobile some considerable distance in the rear.
They also had with them a supply of eggs. When the
automobile reached a point from which the girl on the
bicycle ahead could be seen, the attorney would sound
his horn, at which time Turner and the girl would each
drop an egg. The distance between the two eggs was
then measured. A series of such experiments re-
vealed that when the bright lights of the automobile
were used the distance between eggs was 225 feet,
and when the dim lights were used the distance was 175
feet.

While the witness was testifying regarding the
experiment, appellant's counsel from time to time in-
sisted that it be shown that the conditions were similar,
and in compliance with those demands, the similarity
of conditions was accordingly developed. At no time
was any definite objection made to the admissibility
of the evidence except as to one feature, and that was
with respect to a point designated by the witness as
being the place where the second girl on the bicycle
was stationed at one stage of the experiment. That
objection, however, cannot now be considered be-
cause the point so designated by the witness was not

marked upon the map to which he referred, and is therefore not preserved in the record.

Furthermore, matters of this kind rest largely in the discretion of the trial court, and are reviewable only for abuse of sound judicial discretion. *Halverson v. Seattle Electric Co.,* 35 Wash. 600, 77 Pac. 1058; *Truva v. Goodyear Tire & Rubber Co.,* 124 Wash. 445, 214 Pac. 818; *Washington v. Seattle,* 170 Wash. 371, 16 P. (2d) 597, 86 A. L. R. 113; and, as we have also held, the exercise of such discretion will, on appeal, be viewed somewhat more critically when such evidence is rejected than when it is received. *Amsbary v. Grays Harbor R. & Light Co.,* 78 Wash. 379, 139 Pac. 46, 8 A. L. R. 1.

We are of the opinion that the conditions and circumstances attending the experiment were substantially the same as, or at least closely similar to, those present at the time of the accident, and that the court did not err in admitting the evidence.

The judgment is affirmed.

ROBINSON, C. J., MAIN, DRIVER, and BLAKE, JJ., concur.