Wisner *v.* Osborne.

FERDINAND H. WISNER, trustee,

*v.*

J. K. OSBORNE et al.

[Filed May 16th, 1903.]

An insolvent debtor permitted his infant son who lived with him to contract for wages to be paid to the son.—*Held*, that the stock of a corporation into which the wages were afterwards converted and which stood in the name of the son, is not subject to the claims of his father's creditors.

*Mr. Beecher* and *Mr. Thompson,* for the complainant.

*Mr. John R. Hardin,* for the defendants.

Stevens, V. C

This case is, in its essential features, like *Taylor* v. *Wands,* *10 Dick. Ch. Rep. 495.* There John Taylor, as here J. K. Osborne, having failed in business and being heavily indebted, undertook to form a corporation, putting in as capital money derived from the surrender of an insurance policy issued for the benefit of the wife. There, as here, the stock representing the money put in was, most of it, issued to the wife. There, as here, the debtor took one share. of stock to qualify him to become a director and president, and there, as here, the stock, chiefly through the debtor's skill and experience, increased greatly in value and the company earned and paid large dividends. It was there held by the court of errors that the wife and her transferees were not only entitled to retain the stock as against her husband's creditors, but were also entitled to the company's earnings, although, as Mr. Justice Magie said in that case, the corporation owed its success to the husband's business ability and exertions.

I cannot find anything in the proofs to differentiate that case from this.

The evidence is voluminous and some of it vague and conflicting, but the material facts are few in number and not controverted. Much of the evidence relates to a period when the company's affairs became prosperous, and has little, if any, bearing upon the merits, being admitted only because it was claimed that it would throw a reflex light upon the period of organization in 1892. It does not seem to me to illumine that period at all or to cast any doubt upon the real character and the good faith of the original transaction if we view it in the light of the law as authoritatively laid down in *Taylor* v. *Wands.*

For three years the company had a precarious existence, having few assets, loaded down with debts and subject to chattel mortgage sales. Had this suit been brought during that period there would have been absolutely nothing on which to found a decree that the stock or the property was really the husband's and subject to his debts. The mere fact that this company, after that time, became prosperous and that its prosperity was due in large measure to the efforts of the husband in his char-

acter of officer and manager cannot convert that into his property which before belonged to his wife.

Section 9 of the bill of complaint charges that the stock of the company belongs to Joseph K. Osborne, but that fifty shares stand in the name of his son, Edgar, and section 15 charges that the stock is in equity subject to the lien of the judgment. In support of this vague allegation the plaintiff relies upon the following facts: Edgar came of age on June 29th, 1894. Both before and after that time he lived with his father. At the age of seventeen he went to work in a printing office in New York. He received first $5 a week and afterwards $10. A part of his earnings he, with his father's consent, invested in stock of the Eighth Ward Building and Loan Association. The investment was made in his own name. When the J. K. Osborne Manufacturing Company was organized he sold this stock and gave the proceeds ($400) to its treasurer. For this he received on October 29th, 1892, three shares of the J. K. Osborne Company.

About the same time he went into that company's employ, receiving first $5 a week, then $10, and afterwards more. On April 27th, 1895, the company was indebted to him for salary the sum of about $800. On that day an agreement, in writing, was entered into between himself, his father and mother and one Wolfe for an apportionment of one hundred and seventy-five shares of unissued stock, by the terms of which he was to receive, and did in fact receive, thirty-two shares. This was received by him apparently in satisfaction of the moneys owing to him at the time by the company. The stock certificate book and the minutes show that the stock was issued to the stockholders in a very irregular way, but, so far as Edgar's liability to the complainant is concerned, these irregularities are not very material. The issue to Edgar of three shares is thus shown to have been made at a time when he was a minor, and the $800, for which the thirty-two shares were issued, represented wages or salary due in part before and in part after he came of age. The contention is that the money which Edgar put in and the wages due for his labor before his majority belonged to his father, and that consequently the stock given for them is, in law,

stock held by him in trust for his father and subject to the claims of his father's creditors.

I will assume that the before-mentioned allegations of the bill are sufficiently specific to permit this contention being urged. On that assumption I do not think that the claim can be maintained. The question is, can a father who is indebted permit his minor son, as against his creditors, to receive and invest his earnings and hold them as his own?

According to the Roman law, children of any age, begotten in lawful wedlock, were under their father's power. As regarded the person, this power, until after the time of Augustus, extended to their life and liberty; as regarded property, in the words of the *Inst. Lib. 11 tit. 9:*

"Anciently whatever came to children, male or female, was acquired for the parents without any distinction, if we except the 'peculium Castrense,' and this so absolutely that what was acquired by one child the parent might have given to another or to a stranger or sold it or applied it in what manner he thought proper."

In the time of Justinian, however, the father was only permitted to take the usufruct of what the son had acquired by any other means than his father's fortune. The father might, indeed, have emancipated the son, but emancipation, at any age, depended almost entirely upon the father's will.

In striking contrast with the civil law is the common law. That law gives the infant's property to the infant. It does not even give the father the usufruct or enjoyment of it during the limited period of the son's minority. Says Blackstone (*1 Bl. 453*):

"A father has no other power over his son's estate than as his trustee or guardian, for though he may receive the profits (of land held by Socage tenure) during the child's minority, yet he must account for them when he comes of age."

As to personalty, says Judge Vredenburgh, in *Graham* v. *Houghtalin, 1 Vr. 557,* when a child, in the lifetime of its father, becomes vested with it, "no one is strictly entitled to

take it as guardian until a guardian has been duly appointed by some public authority." Under paragraph 38 of the Orphans Court act (*Gen. Stat. p. 2363*), first enacted in 1843 (*P. L. of 1843 p. 84*), the father may be appointed guardian of the estate, real and personal, of his minor children.

The law is that the minor's property, however acquired, is his own, and that even the father, if he be trusted with its administration, must account to the infant for it when he comes of age.

This is the *status* of the minor's property. Now, as to his earnings. Says Blackstone (*1 Bl. 453*) :

"He [the father] may indeed have the benefit of his children's labor while they live with him and are maintained by him, but this is no more than he is entitled to from his apprentices or servants."

But it has been held that if the contract, made with his father's consent, be to pay the child, then the child is entitled to his earnings and may enforce his right to them by suit. *Snediker* v. *Everingham, 3 Dutch. 143.* They belong to him just as any other property belongs to him. It is obvious that the contract may assume several phases. The father may (1) contract with the employer for his son's service, and may expressly stipulate that the wages shall be paid to him (the father) ; or (2) he may stipulate generally for such service without saying to whom the wages shall be paid, and in either case he alone will be entitled to sue for them; or (3) as was done in *Snediker* v. *Everingham, supra,* he may stipulate that the wages shall be paid to the son, in which case the son may sue for them; or (4) the son, with the father's consent, may make the bargain for wages payable to himself (the son), in which case, also, the son may sue for them; and the father's consent may be expressly given or it may be implied from circumstances. *Stall* v. *Fulton, 1 Vr. 430.* It has always been the law that an infant's contract, beneficial to himself, is not necessarily void, but, in general, voidable at the option of the infant when he arrives at full age. It is often capable of being enforced by the infant against the other party to it. The law is thus stated in *5 Bac. Abr. 134 tit. "Infancy and Age:"*

"It is laid down as a general rule that infancy is a personal privilege, of which no one can take advantage but the infant himself, and that therefore, though the contract of the infant be voidable, yet that it shall bind the person of full age. For being an indulgence which the law allows infants to protect and secure them from the fraud and imposition of others, it can only be intended for their benefit and is not to be extended to persons of years of discretion who are presumed to act with sufficient caution and security. And were it otherwise, this privilege instead of being an advantage to the infant might in many cases turn greatly to his detriment."

It has been held that where a contract for service made by an infant is shown to be beneficial to him, it may be binding upon him. *Leslie* v. *Fitzpatrick, 3 Q. B. Div. 229*. Tested by these well-established rules, it is entirely clear that the creditors of J. K. Osborne cannot assert with success that the stock held by Edgar belongs to his father. The fair implication from the evidence is that the agreement with the printer was made for Edgar's benefit and that the wages were to be paid and were actually paid to him. His ownership of the money thus received is further evidenced by his investment of it in his own name, without objection on the part of his father, in a building association, and by his subsequent payment of it to the J. K. Osborne Company. So, too, as far as appears, the contract of the J. K. Osborne Company was to pay, not his father, but Edgar; and his father's assent to the arrangement appears not only from the fact that he was the company's manager, but also from the fact that he joined in the agreement of April 27th, 1895, which gave the stock to Edgar. Up to the moment when Edgar took the stock the wages, therefore, were his own, and if his, then the stock into which they were converted was his also.

But it is said that while a father may give to his son his son's earnings when solvent he may not do it when insolvent. This proposition is fallacious in that it implies that all the son's earnings, past and future, under all circumstances, belong absolutely to the father, who it is said has no more right to make a gift of them than he has to make a gift of any other of his property.

This might be true of a case in which the father has bargained for payment to himself, if wages might be claimed in a creditor's bill, a claim, under the law of New Jersey, of more than

doubtful validity in view of the provisions of our Execution and Chancery acts (*Gen. Stat. p. 1423 § 40; Gen. Stat. p. 390 § 91*), which exempt from seizure what is due for the labor or personal services of the debtor or any member of his family, and of what is said in *Whitney* v. *Robbins, 2 C. E. Gr. 363,* viz., that the court of chancery has no original jurisdiction to collect the choses in action of a debtor and apply them to the payment of his debts.

If a son's wages are not subject to the claims of creditors either at common law or by statute, their transfer to the son cannot be fraudulent. But, however this may be, the proposition above contended for could not be true of a case in which the bargain, made with the father's consent, was that the wages should be paid to the son. In such a case they would belong to the son *ab initio*. He might, as I have shown, enforce payment of them by action.

The contention would then go to this extent—that when a father is indebted, he is under a disability that will prevent him from allowing his son to make a bargain for wages—he must compel his son to labor for the benefit of his father's creditors. No such doctrine is to be found in our law. *Atwood* v. *Holcomb, 39 Conn. 275.*

There are two cases in our court of last resort which are very much in point. The first is *Peterson and wife* v. *Mulford, 7 Vr. 481.* In that case it was decided that a husband might permit his wife to labor for herself and to appropriate to her own use the avails of her labor, and that such permission is good against the creditors of the husband if such proceeds have not actually been reduced into his possession. In this case the wife had saved $200 out of her earnings. She took the money and with it and with a note which she gave, procured an assignment to herself of a mortgage upon property of her husband at a time when he was heavily indebted. She did it at his suggestion and with his consent, and it was held that the transaction was valid as against her husband's creditors. This was a stronger case than that of an infant, for at common law the husband's control over his wife's earnings was absolute. At the time of the decision the statute had not, as it now has, given to the married woman

Wisner *v.* Osborne.

her own earnings. The court nevertheless said: "Though the earnings of a wife are not within the provisions of the Married Woman's act, yet in a series of decisions in this state arising out of the spirit of that act and in accordance with its provisions, it has been held that the earnings of a married woman working on her own account by her husband's permission, or earned in working for herself without his permission, if given to her by him, are her separate property and within the provisions of that act, and that a husband is not bound to compel his wife to labor for his creditors or to appropriate her earnings for them, and that such permission and gift are valid as against his creditors."

A still more direct authority is that of *Costello* v. *Prospect Brewing Co., 7 Dick. Ch. Rep. 557.* The syllabus of that case is as follows:

"A wife to whom her husband had made a voluntary conveyance of an equity of redemption of real estate, paid, with her husband's consent, out of her own and her children's earnings, a portion of the mortgage debt. On a bill filed by her husband's precedent creditors to set aside the conveyance to the wife as fraudulent—*Held*, that the decree should preserve the right of the wife to a lien for the amount which she had so paid."

Judge Reed, delivering the opinion of the court, said: "The right of a father to forego his claim to the earnings of his children is equally clear. He may sell or give to the infant his time or authorize him to make contracts in his own name and receive pay therefor, and in such case the minor may sue for and recover his wages. There is no rule of law which requires the husband to compel the wife or the parent to compel the children to work for his creditors."

In the case in hand it is as I have said a fair inference from the evidence that the contract for wages was made with the father's consent and that it contemplated payment to the son. The wages, therefore, belonged to the son and not to the father. They were as much his property as anything that came to him by gift or bequest. When he received them he could invest them as he pleased.