[No. 31168.    Department Two.    May 29, 1950.]

GUY H. HINES, *Individually and as Guardian ad Litem for Alan Hines, a Minor, Appellant,* v. P. L. CHESHIRE *et al., Respondents.*[1]

[1]Reported in 219 P. (2d) 100.

*Bounds & Splawn,* for appellant.

*Tonkoff & Holst,* for respondents.

HAMLEY, J.—This is an action brought on behalf of a minor by his father as guardian *ad litem,* to disaffirm and rescind a contract to purchase an automobile and recover the purchase price. The jury returned a verdict for defendants and judgment was entered accordingly. Plaintiff has appealed.

The principal question presented is whether disaffirmance and recovery of the purchase price is precluded by the fact that the father personally obligated himself to pay a portion of the purchase price after the car had been repossessed by the seller.

The minor, Alan Hines, purchased a 1941 used Pontiac sedan from Cheshire Motors on June 19, 1947. The total price, including insurance and other charges, was $1,563.40. Alan paid $850.60 down, and agreed to pay the balance in monthly payments of $59.40. Alan was then eighteen years of age and so represented to the person who waited upon him. The boy was informed that it would be necessary to have an adult also sign the conditional sale contract. One Diel Whitesell, an adult friend of Alan's, agreed to perform this function. Alan and Whitesell thereupon signed the conditional sale contract, which, however, named Alan Hines as the sole purchaser. From this point on, Whitesell had no part in any of the transactions in question. He had nothing to do with the automobile or the payments thereon, and, in fact, soon left the state for the middle west.

Alan took possession of the car on June 19, 1947, when the contract was signed. Cheshire Motors immediately sold and assigned that contract to Seattle-First National Bank, Yakima branch. A collision insurance policy was thereupon issued to Alan by Commerce Insurance Company. The certificate of title, issued on July 31, 1947, by the state department of licenses, showed Alan Hines as the registered owner and the bank as legal owner. From this time until February, 1948, when Cheshire Motors repurchased the contract from the bank, Alan made all the monthly payments to the bank.

On July 21, 1947, Alan arranged to have Cheshire Motors install a new motor in the car, the cost to him being $190.07. Late in September, 1947, the car was stolen and badly damaged. It was at this time that Alan's parents learned for the first time that he had purchased the car. They did not, upon acquiring this information, take any action with respect to the purchase or the boy's use of the vehicle. A written es-

timate of repairs, made out by Cheshire Motors on October 1, 1947, names Alan Hines as the customer. The car was repaired and the repair bill was paid for by the insurance company, except for the initial fifty dollars.

In January, 1948, the car was again seriously damaged in an accident, while being driven by one Joe Hall, to whom Alan had loaned the car. For some reason not disclosed in the record, this damage was not covered by the insurance policy which had been issued. Shortly after this accident, the insurance policy was canceled. Cheshire Motors, which had possession of the damaged vehicle, estimated the cost of repairs at $400.97. The estimate of repairs, dated January 23, 1948, again names Alan Hines as customer.

It is at this point that Guy H. Hines, the father of Alan, first entered the picture. He and his wife went to the place of business of Cheshire Motors about February 1, 1948. They saw the car and examined the estimate of repairs. A few days later Guy H. Hines returned and requested Cheshire Motors to repair the car, saying that he would be responsible for the bill. The two repair orders issued by Cheshire Motors on February 3, 1948, however, named Alan Hines as the customer. On February 16, 1948, the repairs having been completed, Guy H. Hines and his son went to Cheshire Motors to see the car. While the evidence is in dispute on the point, the view most favorable to respondents and one which the jury was entitled to believe, was that Guy H. Hines then executed his personal check in the sum of $437.02, payable to Cheshire Motors, in full payment for these repairs.

Cheshire Motors then refused to deliver the car until the $262.69 balance remaining due on the purchase price had been paid. The apparent reason for this was that the bank, feeling insecure under the circumstances, had chosen to exercise its right under its assignment agreement with Cheshire Motors to require the latter to repurchase the contract. A combined promissory note and chattel mortgage form was then made out, dated February 16, 1948, reciting that Alan Hines agrees to pay Cheshire Motors $337.38, in six monthly

installments of $56.23 each, beginning March 15, 1948, and mortgaging the Pontiac to secure payment. This paper was not signed by Alan, but by his father, Guy H. Hines. This form lists "car repairs" as the consideration for the promise to pay $337.38. However, Guy H. Hines had already paid for the car repairs, and the $337.38 named in this form is the exact amount of the remaining purchase price on the car plus $59 for insurance and $15.69 for financing charges. The jury was accordingly entitled to believe that the form signed by Guy H. Hines on February 16, 1948, was for the purpose of refinancing the balance of the purchase price.

Cheshire Motors thereupon paid to the bank the $262.69 balance on the purchase price, took a reassignment of the original contract, and arranged with General Motors Acceptance Corporation to handle the refinancing. The new insurance policy and the General Motors Acceptance Corporation payment record booklet, issued in connection with this transaction, list Alan Hines as purchaser. Alan made the March, April and May, 1948, payments of $56.23 each under the refinanced contract, and had possession of the car during this period.

Early in June, 1948, the body and fenders of the car were again damaged. Before the car could be again repaired, Alan was convicted of the crime of burglary and committed to Monroe reformatory. While he was away his father had the car taken to Cheshire Motors to obtain an estimate of repair costs. The record is not clear whether these repairs were actually made.

Guy H. Hines made the final three monthly payments on the refinanced contract. When the final payment was made, the original conditional sales contract, the certificate of title, insurance policy, and executed note and chattel mortgage form of February 16, 1948, were handed or mailed to Guy H. Hines. As indicated above, all of these documents show Alan Hines as the purchaser or registered owner, except that the note and chattel mortgage form, while naming Alan as promissor, is actually signed by his father. From the time Alan went to the reformatory until the trial in June, 1949,

the car was kept in storage at the family home, except while the vehicle was at Cheshire Motors for a repair estimate. Both the father and mother had cars of their own and at no time made any use of the Pontiac.

On August 12, 1948, Cheshire Motors was notified that Alan desired to disaffirm the purchase of the car and obtain a refund of the purchase price, the car being tendered back to the company. Cheshire Motors declined the tender and refused to disaffirm the contract and return the purchase price. Guy H. Hines, as guardian *ad litem* for Alan Hines, thereupon instituted this action against P. L. Cheshire and his wife, doing business as Cheshire Motors. The prayer of the complaint asks for judgment in the sum of $1,503.40.

The defendants obtained an order making Guy H. Hines an additional party defendant. The case was tried to a jury, which, as heretofore indicated, returned a verdict for defendants. A judgment was then entered dismissing the complaint and granting P. L. Cheshire and wife costs against Guy H. Hines, as guardian *ad litem* for Alan Hines. Guy H. Hines has appealed, not only in his capacity as guardian *ad litem*, but also in his individual capacity as an additional party defendant.

Respondents open their brief with a motion that the appeal be dismissed as to Guy H. Hines individually, for the reason that no judgment or appealable order has been entered against him individually. This motion must be granted. An appeal can only be taken by the party aggrieved. Rem. Rev. Stat., § 1716 [P.P.C. § 5-1]. No judgment or appealable order having been entered against Guy H. Hines, individually, he is not, as an individual, affected or injured by the judgment of the trial court. See *Terrill v. Tacoma*, 195 Wash. 275, 80 P. (2d) 858.

The term appellant, as hereinafter used, will refer to Alan Hines, for whom Guy H. Hines appears as guardian *ad litem*.

Appellant presents six assignments of error, the last one being that the court erred in denying appellant's motion for judgment notwithstanding the verdict, and, in the alternative, in denying appellant's motion for a new trial.

A motion for judgment notwithstanding the verdict involves no element of judicial discretion and cannot be granted unless the court can say, as a matter of law, that there is neither evidence nor reasonable inference from evidence to sustain the verdict. *Larpenteur v. Eldridge Motors,* 185 Wash. 530, 55 P. (2d) 1064; *Omeitt v. Department of Labor & Industries,* 21 Wn. (2d) 684, 152 P. (2d) 973. In considering such a motion, the evidence must be interpreted most strongly against the moving party and in the light most favorable to the opposing party. *Fosdick v. Middendorf,* 9 Wn. (2d) 616, 115 P. (2d) 679. But where the evidence is so interpreted and the conclusion is nevertheless necessary that the verdict is without substantial support in the record, it is error for the trial court to deny a motion for judgment n. o. v. *Stevich v. Department of Labor & Industries,* 182 Wash. 401, 47 P. (2d) 32.

The facts in this case are not seriously in dispute except with reference to the repair bill and refinancing transactions which took place on February 16, 1948. In these and all other matters the summary of facts set out above is presented in the light most favorable to respondents, as required by the foregoing rule. The question presented by appellant's last assignment of error is, therefore, whether the facts, as so stated, provide substantial support for the verdict in favor of respondents.

This being an action by a minor to disaffirm and rescind a contract, the applicable statute is Rem. Rev. Stat., § 5829 [P.P.C. § 357-1], reading as follows:

"A minor is bound, not only by contracts for necessaries, but also by his other contracts, unless he disaffirms them within a reasonable time after he attains his majority, and restores to the other party all money and property received by him by virtue of the contract, and remaining within his control at any time after his attaining his majority."

It is admitted that Alan Hines was a minor at the time the contract to purchase the car was executed, and that this fact was then known to respondents. Respondents do not contend that Alan failed to disaffirm in a timely or proper

manner, or that he failed to tender back the car which he had purchased.

The evidence was in dispute as to whether the car, after being several times damaged in accidents, had been restored to as good a condition as when purchased by Alan. But, in any event, this is entirely immaterial. As we said in *Snodderly v. Brotherton,* 173 Wash. 86, 90, 21 P. (2d) 1036, in affirming a judgment in favor of a minor:

"It is the general rule, announced and followed by a great majority of the courts in this country, that an infant, on disaffirming his contract, is required to return only so much of the consideration as remains in his hands in specie, and is not required to make good to the other party the portion of the consideration that has been disposed of, lost or wasted during his infancy. This is particularly true where the contract is for the purchase of personal property. 31 C. J. 1070-1; 11 A. L. R. 491; 50 A. L. R. 1187."

Respondents originally asserted, as one of their defenses, that the sale was actually made to Diel Whitesell, an adult, and that the purported disaffirmance by Alan was accordingly without effect. However, no instruction was given embodying this theory, and respondents do not, on this appeal, appear to rely upon the contention that disaffirmance is ineffectual because Whitesell signed the purchase contract. Nor have respondents defended on the ground that the father, Guy H. Hines, became a *joint* obligor with the son, by reason of the February 16, 1948, transaction, and that Alan's statutory right of disaffirmance was thereby defeated.

In any event, the law seems to be settled that an infant is not precluded from disaffirming by reason of the fact that an adult joined with him in signing the contract. *Wharen v. Funk,* 152 Pa. Super. 133, 31 A. (2d) 450; *McBriety v. Spear,* 60 A. (2d) (Md. Ct. of App.), 528; 43 C. J. S. 186, Infants, § 76. See, also, *Snodderly v. Brotherton, supra.* The fact that the adult assuming such joint liability happened to be the minor's father would be immaterial. See *Pacific Finance Corp. v. Gilkerson,* 217 S. W. (2d) (Tex. Civ. App.), 440.

■ Examination of the instructions indicates that the defense theory actually submitted to the jury was that the father became a party to the purchase contract in *substitution* for his son. This presented the question of whether there had been a modification of the original contract, or a novation, whereby the original agreement was extinguished. But respondents, in their brief on appeal, expressly disclaim any defense based upon modification of the original contract, or a novation, whereby the original agreement was extinguished, Alan's obligations thereunder were terminated, and a new agreement was entered into between Cheshire Motors and Guy H. Hines. Moreover, the facts would not support such a contention. There was here no subsequent agreement entered into by all of the parties, *including Alan,* whereby his rights and liabilities under the original agreement were assumed by his father. The first essential of a valid novation was therefore lacking. *Prescott Co. v. Franklin Tool Works,* 117 Wash. 283, 201 Pac. 308; *Schrock v. Gillingham, ante,* p. 419, 219 P. (2d) 92.

The theory upon which respondents now rely in support of the judgment may be stated as follows: The parent is entitled to the earnings of an unemancipated minor. Where the parent is entitled to the earnings of a minor, such parent owns any property which the minor purchases with these earnings. Alan was an unemancipated minor. Accordingly, when Alan bought the Pontiac, it automatically became the property of his father, Guy H. Hines. Exercising that property right, the father, although not actually using the car for his own purposes, paid the repair bill when the car had been repossessed by Cheshire Motors in February, 1948, and obligated himself to pay the balance of the purchase price. The father was therefore the real party in interest in this suit and is seeking to use the minor son's disaffirmance as a means of recovering his own money.

The jury was not instructed on this theory, and therefore the verdict was not based upon such a proposition. We have nevertheless given consideration to this defense theory as though adequately presented to, and considered by, the jury.

It will be observed that, under this theory, respondents would be able to defeat the boy's recovery even if the father had never signed the February 16, 1948, instrument obligating himself to pay the balance of the purchase price. This is true because, under this theory, the car became the property of the father when it was first purchased, in June, 1947. The February 16, 1948, transaction, therefore, is to be considered not as a necessary factor in establishing this theory, but merely as evidence that the father was asserting a property right already his, and that there had been no partial emancipation or relinquishment of earnings which would negative such property right in the father.

Considering first the significance of the February 16, 1948, transaction, it is our conclusion that there is no substantial support in the record for the view that the father's act in paying the repair bill or signing the promissory note constituted an exercise of property right in the car. Both the father and son denied that the father intended to exercise such a right. With respect to the repair bill, the father's act in paying the same was no more an assertion of ownership than in any case where one pays for the repairs to the chattel of another. The bills which the father paid and the earlier repair estimates were prepared by respondents and named the son, not the father, as the customer. At most, the father's act in paying these bills indicates only a loan or gift to Alan of the sum paid.

At this time the father also signed a combined promissory note and chattel mortgage form, obligating himself to pay $337.38 in six monthly installments, this amount representing the unpaid balance on the car, plus insurance and financing charges. In reality this was not a chattel mortgage but only a promissory note, since neither the father nor his son was the legal owner of the car. This form, although signed by Guy H. Hines, names Alan Hines as promisor. Likewise, the new insurance policy and the credit record booklet listed Alan as purchaser. The original conditional sales contract, naming Alan as purchaser, was not canceled and returned to Alan at this time, but was retained until the balance was

paid in full. Alan made the next three monthly payments. It was only after Alan was committed to Monroe reformatory in June, 1948, that his father made any payments.

The father made the final three payments and then received the papers and documents, including the certificate of title, all naming Alan as registered owner or purchaser. There had never been any transfer of documents from son to father. The father at no time used the car. His only voluntary appearance in this action was as guardian *ad litem* in support of Alan's assertion of ownership of the vehicle.

Giving respondents the advantage of every reasonable inference, it must be held that this evidence fails to substantiate the claim that the father purported to exercise any property right in the car. The situation is rather one where Cheshire Motors, without releasing Alan as original purchaser, insisted upon and obtained the written promise of the father as additional security. Accordingly, the February 16, 1948, transaction cannot be said to support respondents' defense theory that, because of the parental relationship, the car purchased with the son's earnings was the property of the father.

We turn now to the law applicable to this defense theory. There is no question but that in this state, as elsewhere, the parents are legally entitled to the earnings of a minor child, unless there has been an emancipation. *Daly v. Everett Pulp & Paper Co.,* 31 Wash. 252, 71 Pac. 1014; *American Products Co. v. Villwock,* 7 Wn. (2d) 246, 109 P. (2d) 570, 132 A. L. R. 1010; 46 C. J. 1281, Parent and Child, § 79. But, where the parent voluntarily relinquishes the right to his child's earnings, and permits the child to earn for himself, the child may receive his earnings and appropriate them at pleasure. *Marlar v. Smith,* 134 Miss. 76, 98 So. 338; *Lottinville v. Dwyer,* 68 R. I. 263, 27 A. (2d) 305; 1 Schouler, Marriage, Divorce, Separation and Domestic Relations (6th ed.) 816, § 754.

This waiver or relinquishment of the parent's right to the earnings of the infant is sometimes called partial emancipation. *Bonner v. Surman,* 215 Ark. 301, 220 S. W. (2d) 431;

*Lottinville v. Dwyer, supra; Wood v. Wood,* 135 Conn. 280, 63 A. (2d) 586; 39 Am. Jur. 705, Parent and Child, § 64. An exhaustive annotation on this point, to be found in 165 A. L. R. 733, summarizes the rule as follows:

"When parents allow or compel a minor child to hire himself out to others and permit him to collect and retain his earnings and spend them as he pleases, without asserting a claim thereto based upon their legal right to the services and earnings of their minor children, this amounts to a waiver of the parental rights to such services or earnings and constitutes an implied emancipation of the child with resultant legal incidents upon the rights of the parent and the child."

The uncontroverted facts show that there was such a relinquishment of earnings here. Alan had been working for three or more years as a warehouseman for J. M. Perry Co., prior to the purchase of the automobile. His salary at the time of the purchase was two hundred dollars a month. His father knew of Alan's employment and that the boy received and retained a good salary. The boy maintained his own bank account. While he lived at the family home, this circumstance does not, standing alone, negative a finding that there has been a complete or partial emancipation. *Wisner v. Osborne,* 64 N. J. Eq. 614, 55 Atl. 51; *Wood v. Wood, supra;* 39 Am. Jur. 703, Parent and Child, § 64. See, also, the annotation in 165 A. L. R. 742.

It follows that, where the parent has relinquished his right to the child's earnings, the property purchased by the child with such earnings belongs to the child. *Marlar v. Smith, supra;* 46 C. J. 1314, Parent and Child, § 138.

Aside from the application of the general principles referred to above, the fact that the father appears here as guardian *ad litem* in support of his son's claim for return of the purchase payments, gives rise to a strong inference that the father had relinquished his right to the earnings of his son and recognized his son's property right in the car.

This precise point was dealt with in *Dodson v. Roberts,* 4 S. W. (2d) (Tex. Civ. App.) 155, 157, where the father appeared as guardian *ad litem* for his minor son who was

seeking to disaffirm a contract to purchase a car and obtain a return of the purchase payments. In affirming a judgment for plaintiff, the court said:

"It is suggested by appellee that, since the money paid by appellant was earned by him, this money belonged to his father, and that therefore appellant made no case entitling him to judgment for the return thereof. The father of appellant directed this suit as next friend, and also testified as a witness for appellant. By bringing this action in the name of the infant as his next friend, appellant's father would be thereby estopped from afterward asserting a personal claim inconsistent with that of the infant. 14 R. C. L. p. 282, § 51. His action in asserting in court that the money belonged to his minor son evidenced a relinquishment by him of the money to his son."

The same principle was involved in *Daly v. Everett Pulp & Paper Co.,* 31 Wash. 252, 71 Pac. 1014. In the *Daly* case it was held that the appearance of the father as guardian *ad litem* in an action by his minor son to recover damages resulting from injuries sustained while employed in the defendant's plant, effected an emancipation as to the son's earnings, thereby estopping the father in a subsequent action brought by the latter to recover for loss of the son's services as a result of the same accident.

It is to be noted that in *Snodderly v. Brotherton,* 173 Wash. 86, 21 P. (2d) 1036, we sanctioned a minor's disaffirmance of a contract to purchase an automobile under circumstances very similar to those existing in the present case. Respondents argue that in the *Snodderly* case the minor bought the car with money which he had inherited instead of earned. This is not the case, as the only money which the minor had paid at the time he disaffirmed was his initial payment of three hundred dollars, evidenced by the turn-in of a truck which he had previously purchased.

Respondents cite two cases which appear to support their contention that Alan's earnings belonged to his father and he was therefore not entitled to disaffirm and recover the purchase payments. In the first of these, *Stark v. Slack,* 247 S. W. (Tex. Civ. App.) 352, the decision was based upon the

conclusion that the minors were not emancipated and that the father, as owner of the earnings, could have brought an action in his own name to recover the purchase payments. The decision does not discuss the principles of relinquishment of earnings, partial emancipation, or estoppel by reason of the father's appearance as guardian *ad litem*. The second case cited by respondents is *Fulwiler Electric Co. v. Spann,* 252 S. W. (Tex. Civ. App.) 892. The court, without mentioning the principles referred to above, held that the minor's earnings belonged to his father, who alone would have a right to recover the purchase payments. At the time these Texas cases were decided, there was no statute in that state embodying the public policy in favor of disaffirmance, as set forth in Rem. Rev. Stat., § 5829.

A third case cited by respondents, *Southern Automobile Co. v. Holifield,* 145 Miss. 51, 111 So. 96, is not in point. There the automobile dealer brought an action against the father, who had received and retained a new car which his son had obtained from the dealer by turning in the father's used car. The court held, consonant with the general rule, that the father had ratified the contract and therefore could not defend on the ground of his son's infancy.

While the *Stark* and *Fulwiler* cases tend to support respondent's position, we believe that they are contrary to the weight of authority. Moreover, we feel that the sound public policy, given sanction in Rem. Rev. Stat., § 5829, whereby minors may disaffirm improvident and unwise contracts and recover sums paid thereunder, would be unduly restricted if held to apply only where the minor has been completely emancipated, or where the purchase was made with money obtained from some source other than the minor's earnings. The importance of sustaining this public policy was emphasized in our opinion in *Snodderly v. Brotherton, supra.*

In view of the practically uncontroverted facts and the law applicable thereto, we therefore conclude that there is neither evidence nor reasonable inference from evidence to sustain the verdict for respondents. The motion to enter

judgment for plaintiff notwithstanding the verdict of the jury should, accordingly, have been granted. It is unnecessary to consider the other assignments of error.

Appellant sought return of $1,503.40 alleged to be the total amount paid under the contract. The conditional sales contract shows that the agreed purchase price of the car was $1,395, to which was added $16.75 for license and filing fees, $41.85 for sales tax, $52.80 for finance charges, and $57 for insurance charges; the total gross purchase price being $1,563.40. Of this sum, Alan paid $1,300.71 prior to the February, 1948, refinancing. He paid three monthly installments of $56.23 each, or a total of $168.69, under the new payment arrangement then entered into. His father paid the remaining three installments. Alan therefore paid a total of $1,469.40, and his father paid $168.69.

A minor who disaffirms his contract is, in no event, entitled to recover any sums paid under the contract by another person. *Freitas v. Cordeiro,* 122 Cal. App. 319, 9 P. (2d) 882; *Jennings v. Hare,* 47 S. C. 279, 25 S. E. 198; *Fulwiler Electric Co. v. Spann, supra; McCarty-Greene Motor Co. v. McCluney,* 219 Ala. 211, 121 So. 713; 43 C. J. S. 177, Infants, § 75. Appellant is therefore not entitled to recover the $168.69 paid or advanced by his father.

The $1,469.40 actually paid by Alan is $74.40 in excess of the original net sales price, such excess representing miscellaneous charges referred to above. In our opinion, a minor who disaffirms his purchase contract and seeks recovery of sums paid thereunder is not entitled to recover specific amounts added to the sales price to cover license and filing fees, sales taxes and like charges, collected by one who acts only as an uncompensated agent for others. In this case, the finance charges also fall into this category, since all of the financing was handled by the bank or by General Motors Acceptance Corporation. The record does not indicate whether respondents acted as agents in the issuance of the insurance policies and, if so, whether respondents were compensated for such service. In the absence of such

showing, the premiums paid on these policies may not be recovered.

The judgment is reversed and the cause remanded, with instructions to enter judgment for appellant in the amount of $1,395, payable upon delivery to respondents of the Pontiac automobile in question.

SIMPSON, C. J., ROBINSON, MALLERY, and HILL, JJ., concur.

